# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JER VANG, | 1:10-cv-01512-LJO-SKO |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |
| v. | (Doc. 1) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff Jer Vang ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.

## FACTUAL BACKGROUND

Plaintiff was born in 1964 in Laos, is a permanent United States resident, has no formal education, and has never worked. (Administrative Record ("AR") 119, 133-35, 219, 223.) On January 31, 2007, Plaintiff filed an application for SSI, alleging disability beginning on June 30,

2006, due to schizophrenia, paranoid and other functional psychotic disorders, and affective mood disorder. (AR 58, 119-32.)

## A.    Medical Evidence

Plaintiff was seen at Kings Winery Medical Clinic ("Kings Winery") from February 8, 2006, through January 12, 2007, for a variety of medical ailments, including chest pain, stomach ache, headache, leg pain, and recovery from miscarriage.[1] (AR 261-66.) On January 12, 2007, Plaintiff stated that she was very depressed, had suicidal ideations, and was "think[ing] about killing [her]self [with] a knife or gun." (AR 261.) Plaintiff indicated that she "feels scared," "sees people sometimes," "hears voices," and "hears babies crying." (AR 261.) She was referred to Maximo Parayno, M.D. (AR 261, 268.)

From January 14 through January 19, 2007, Plaintiff was admitted to Fresno County Psychiatric Health Facility after making a "suicide attempt . . . with a knife cut to her ankle." (AR 230-31, *see also* AR 215-52.) Plaintiff was diagnosed with "[m]ajor depressive disorder recurrent with psychotic features with delusions." (AR 215.) The hospital records indicate that Plaintiff had no prior history of psychiatric hospitalizations but that she had "overdosed" the prior year. (AR 216.) Plaintiff's hospitalization was "uneventful," and she was "offered individual, milieu, group therapy and pharmacological intervention." (AR 217.) Plaintiff's history indicated that she had experienced depression since she had been a teenager in a Thailand Refugee Camp and had severe depression since she had been in an automobile accident in 1991, which caused her to be unconscious for three days and required her to use a wheelchair for four months and a cane for over a year. (AR 218-19, 223.) Plaintiff reported "visual hallucinations of faces 'getting bigger and bigger' and [chasing] after her as well as hearing 'babies crying'" and that she "fantasiz[ed] about killing herself by various methods." (AR 230.) The hospital notes indicate that Plaintiff's daughter stated she was "afraid" that Plaintiff would be successful in her suicide attempts and that she did not believe that Plaintiff had been "med[ication]-adherent." (AR 231.) Plaintiff was discharged with

---

[1] The Court notes that the record indicates that Plaintiff has had sixteen pregnancies, which have resulted in eleven living children. (AR 30, 219, 221, 223, 230.)

medications of Prozac, Klonopin, and Seroquel; discharge recommendations included a dietary plan and orders to follow-up with Dr. Parayno.[2]

Plaintiff was seen for counseling at Fresno County Mental Health Department ("Fresno Mental Health") from January 17, 2007, through March 9, 2007. (AR 204-10, 409.) Plaintiff reported that she was sad, depressed, had no concentration, and had no interest in daily activities. (AR 209, 210.) The counselor noted that Plaintiff's answers were relevant to the questions asked, her physical movement was slow but that she walked without a cane, she had a flat affect, and her mood was angry and depressed. (AR 208.) Plaintiff participated in group counseling and became more "involved" with the group discussion as her counseling progressed. (AR 204-05.)

Plaintiff was seen at Kings Winery from January 29, 2007, through April 2, 2007, for a variety of medical issues, including depression, medication refills, chronic chest pain, and stomach pain. (AR 327-30.)

In mid-April 2007, Dr. Parayno completed a medical source statement mental assessment. (AR 267-68.) Dr. Parayno found that Plaintiff had poor memory and would have difficulty understanding or carrying out detailed or complex instructions, but did not express an opinion as to Plaintiff's ability to understand and remember very short and simple instructions. (AR 267.) Dr. Parayno indicated that Plaintiff's ability to interact with the public, coworkers, and supervisors was poor, as was Plaintiff's ability to adapt to changes in the workplace, her awareness of normal hazards, and her ability to use public transportation or travel to unfamiliar places. (AR 268.) Dr. Parayno stated that Plaintiff had "psychotic symptoms [and] thoughts." (AR 267.)

In April 2007, Plaintiff continued her counseling at Fresno Mental Health. (AR 314-19.) On April 13, 2007, Plaintiff "participated in [the] group discussion more than she did before" and "displayed less sadness." (AR 318.) Plaintiff said, however, that she was "feeling sad, depressed, and helpless" and that she "depend[ed] on her children and her husband every day." (AR 317.) Plaintiff was encouraged to meet with Dr. Parayno and to "take [her] medication as prescribed."

---

[2] Prozac is the brand name for a preparation of fluoxetine hydrochloride, used to treat depression. *Dorland's Illustrated Medical Dictionary* 730, 1562 (31st ed. 2007) [hereinafter *Dorland's*]. Klonopin is the brand name for a preparation of clonazepam, used to treat panic disorders. *Id* at 379, 1003. Seroquel is the brand name for a preparation of quetiapine fumarate, used to treat schizophrenia and other psychotic disorders. *Id*. at 1590, 1723.

1   (AR 317.)   On April 26, 2007, Plaintiff indicated that her only social activity was her therapy

2   sessions and that she only felt "less depressed" during that time as she was "with her peers."

3   (AR 315.)   On April 27, 2007, Plaintiff was "involved moderately in [the] group discussion" and

4   stated that "her medical problems caused marital problems" and "limited [her] daily activities and

5   socialization."   (AR 314.)

6        On April 28, 2007, Plaintiff was examined by Ekram Michiel, M.D., for a psychiatric

7   evaluation.   (AR 269-71.)   Plaintiff indicated that she was experiencing auditory and visual

8   hallucinations, and that she would "wake up with bad dreams, screaming."   (AR 269.)   Plaintiff

9   stated that her symptoms started ten years previously when she had been in a motor vehicle accident.

10  (AR 269.) Dr. Michiel noted that Plaintiff's past psychiatric history included group therapy and care

11  from a psychiatrist, including medication, but indicated that Plaintiff had "[n]o past psychiatric

12  hospitalizations."   (AR 269.)   Plaintiff informed Dr. Michiel that she was "able to take care of her

13  personal hygiene" but could "not do any more" and did "not go out."   (AR 270.)   Dr. Michiel

14  performed a mental status examination and found that Plaintiff's attitude and behavior were

15  "normal," her mood "depressed," and her "[a]ffect was restricted [and] sad."   (AR 270-71.)   Dr.

16  Michiel found that Plaintiff's thought process was "goal-directed" and her "[t]hought content was

17  not delusional" but that she stated that she was "fearful around people."   (AR 271.)   Dr. Michiel

18  stated that although Plaintiff "[a]dmits to auditory and visual hallucinations," there was "no evidence

19  during the interview of any response to internal stimuli."   (AR 271.)   Dr. Michiel opined that

20  Plaintiff was "able to maintain attention and concentration and to carry out simple job instructions,"

21  "able to relate and interact with coworkers, supervisors, and the general public," but would be

22  "unable to carry out an extensive variety of technical and/or complex instructions."   (AR 271.)   On

23  May 14, 2007, S.V. Reddy, M.D., reviewed Plaintiff's records and affirmed Dr. Michiel's findings.

24  (AR 278-81.)

25       Plaintiff continued to be seen at Fresno Mental Health through May and June 2007.

26  (AR 305-13.)   Her counselors indicated that she was alert and oriented with appropriate grooming

27  and hygiene.   (AR 309-13.)   Plaintiff continued to feel depressed and stated that she suffered from

28  "helpless and hopeless feelings."

On May 21, 2007, G. K. Ikawa, M.D., reviewed Plaintiff's medical records and performed a mental residual functional capacity ("RFC") assessment.[3] (AR 282-84.) Dr. Ikawa indicated that Plaintiff was "moderately limited in her ability to understand, remember, and carry out detailed instructions but not significantly limited in any other area. (AR 282-84.) Dr. Ikawa opined that Plaintiff was "able to sustain" simple repetitive tasks and was "able to relate and adapt." (AR 284.)

On May 24, 2007, Plaintiff informed Fresno Mental Health that she was having transportation problems and that it was difficult for her to attend her weekly counseling; she did not know how to drive and was thus dependent upon someone to bring her to the therapy session. (AR 307.) Plaintiff indicated that she was "feeling sad, depressed and helpless." (AR 307.) She attended sessions again on June 14 and June 28, 2007, and again indicated that she had transportation difficulties and could not attend regularly. (AR 305-06.) Plaintiff stated that she was "depressed and sad," had "no motivation," and "no interest[] in daily activities." (AR 305.)

Between June 7, 2007, and November 6, 2007, Plaintiff was seen at Kings Winery and was medically managed by Dr. Parayno. (AR 320-27, 349-54.) Plaintiff was also seen at Fresno Mental Health from August 30, 2007, through October 26, 2007. (AR 406-08.) Plaintiff indicated that she was sad, depressed, and felt helpless; she was encouraged to continue her support meetings since she was "stable and being able to maintain her current functioning level." (AR 406-08.)

On September 19, 2007, E.E. Wong, M.D., performed a case analysis, reviewed the medical records and affirmed the mental RFC assessment of Dr. Ikawa. (AR 331-33.)

On November 16, 2007, Plaintiff was involuntarily admitted to Fresno Mental Health as being a danger to herself. (AR 391-96.) Plaintiff's daughter had contacted the Fresno County Sheriff and advised that Plaintiff stated "she wanted to kill herself." (AR 396.) Plaintiff "was found hiding in the bushes about [a half] mile" from her home with "a bottle of pills that contained three

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia,* medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

unknown types of pills" and a "bottle of water." (AR 396.) Plaintiff's daughter reported that Plaintiff had "tried to kill herself before by overdosing." (AR 396.)

On November 17, 2007, a crisis assessment was performed at Fresno Mental Health regarding Plaintiff's involuntary hospital admission. (AR 401-03.) Plaintiff indicated that she did not know why she was admitted and did not remember the previous day. (AR 401.) Plaintiff indicated that she did remember "crying" the prior day and stated that "she [was] sad because of her multiple health problems. She believes that since she can't read, write, drive, or do anything around the house, she has no worth to her family." (AR 401.) The assessment determined that Plaintiff indicated that if she was released on that day, "she expects that she will attempt to overdose"; thus, continued "[h]ospitalization [was] required for safety and stabilization." (AR 403.) Plaintiff was, however, ultimately discharged on that date. (AR 391.)

On November 21, 2007, Plaintiff returned to Fresno Mental Health. (AR 390.) Her "[m]ood was depressed." (AR 390.) She "signed a no harm contract," indicating that she would not "harm herself or others." (AR 390.) The notes stated that Plaintiff remained under the care of Dr. Parayno. (AR 390.) Plaintiff was taking Seroquel and Paxil and her social worker "[e]xplained the importance and benefit for taking pyschotropic medications as prescribed."[4] (AR 390.) Plaintiff was seen again on November 29 and 30, 2007, and indicated that she was "sad, depressed, helpless, angry and agitated." (AR 388-89.) Plaintiff reported that she was scheduled to see Dr. Parayno within a few days. (AR 388.)

On December 7, 2007, Dr. Parayno assessed Plaintiff's mental functioning and indicated that Plaintiff had a depressive disorder which resulted in marked limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace; Plaintiff also experienced "one or two" episodes of decompression, but not for an extended duration. (AR 334, 336.) Dr. Parayno indicated that Plaintiff's ability to work was impaired or poor at all levels, including her ability to relate and interact with supervisors and coworkers, work with the public, and carry out

---

[4] Paxil is the brand name for preparations of paroxetine hydrochloride, used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders. *Dorland's* 1405, 1419.

simple one-or two-step as well as complex instructions.  (AR 338.)  Dr. Parayno opined that Plaintiff was "unable to handle [the] pressure [and] stress of a full days['] work."  (AR 338.)

Plaintiff was seen at Fresno Mental Health between December 11, 2007, through October 24, 2008.  (AR 362-86.)  The treatment notes indicate that Plaintiff had "low stress and frustration tolerance" and had "difficult[ies]. . . manag[ing] her anger."  (AR 386.)  Plaintiff was "participating in [a] Hmong support group and receiving psychotropic medications" so as to "learn coping and problem[] solving skills to cope with daily stressors, to reduce depression, [and] to avoid suicide thoughts or attempts and hospitalization."  (AR 386.)  On January 10, 2008, Plaintiff indicated that she was taking her medication as prescribed and that she continued to see Dr. Parayno as scheduled. (AR 380.)  Plaintiff was still feeling "helpless and hopeless" and had "no motivation for any daily activities."  (AR 380.)  On February 14, 2008, Plaintiff reported that she felt "handicapped" because she was dependent upon "her family for transportation and finance" and that she did "not receive appropriate attention from her family and her husband did not understand her anguish."  (AR 379.) On February 28, 2008, the treatment notes indicated that Plaintiff "[a]ppear[ed] relaxed and less sad" and that she made "good eye contact and [was] involved in [the] group discussion."  (AR 377.)

On April 17, 2008, Plaintiff continued her care at Fresno Mental Health and reported that she was not active "in daily chores and her energy decreased due to worry, depression, marital problems and medical condition."  (AR 374.)  Plaintiff indicated that "her husband put her down" due to an "automobile accident in the past 18 years" which caused her to be unable to "fulfill her roles in the family" and thus she "lost respect from her husband and children."  (AR 374.)  On May 1, 2008, Plaintiff indicated that she had "less verbal arguments with her husband because she is able to manage her feelings."  (AR 372.)  On May 15, 2008, Plaintiff stated that her relationship with her husband had become "amicable."  (AR 371.)  Plaintiff still felt "helpless" because she was "unable to fulfill her family roles."  (AR 371.)  On June 12, 2008, Plaintiff indicated that she was "content[]" with the "love and care that she received from her family."  On June 26, 2008, Plaintiff appeared to be "in good spirit" and stated that she not longer had suicidal ideation "because she loves her family"; she was also "involved more in family activities and social life than she [had been] before." (AR 369.)  Plaintiff's relationship with her husband remained "amicable" and Plaintiff was now

"able to control her emotions and express[] feelings in an appropriate way." (AR 369.) On October 17, 2008, Plaintiff stated that she was "feeling less depressed and less tearful" than when she had first started therapy. (AR 363.)

On February 21, 2009, Dr. Parayno completed a mental medical report and assessment. (AR 413-17.) Dr. Parayno diagnosed Plaintiff with a recurrent, severe major depressive disorder with psychotic symptoms and indicated that her response to treatment and prognosis was "fair." (AR 413.) Dr. Parayno indicated that Plaintiff's ability to follow work rules, relate to coworkers, interact with supervisors, deal with work stress, and function independently was "fair" (defined as "limited but satisfactory"), while her ability to interact with the public and maintain attention and concentration was "poor" (defined as "seriously limited but not precluded"). (AR 414.) Plaintiff had a "fair" ability to carry out simple job instructions but a "poor" ability to carry out detailed as well as complex job instructions. (AR 415.) Dr. Parayno also opined that Plaintiff's ability to work was "impaired" in all categories and that her response to treatment and prognosis was "fair to poor." (AR 417.)

On March 19, 2009, psychologist Vang Leng Mouanoutoua, Ph.D., completed a mental medical report form and medical assessment. (AR 418-22.) Dr. Mouanoutoua opined that Plaintiff had a poor ability to follow work rules, relate to coworkers, deal with the public, interact with supervisors, and maintain attention and concentration, and had no ability to use judgment, deal with work stress, or function independently. (AR 419.) Dr. Mouanoutoua found that Plaintiff's ability to carry out simple instructions was "fair" but "limited" and needed "supervision/encouragement." (AR 420, 422.) Her ability to carry out technical or complex job instructions was "impossible," as was her ability to deal with the public and withstand the stress and pressures of a work day. (AR 422.) Dr. Mouanoutoua opined that Plaintiff had a "poor prognosis due to her responses to past [treatment]." (AR 422.)

**B.    Lay Testimony**

On March 20, 2007, Plaintiff completed an adult function report. (AR 142-49.) Plaintiff indicated that she lived at home her family and that her daily activities consisted of "stay[ing] at home, sitting, [and] walking inside." (AR 142.) Plaintiff indicated that her illness affected her sleep

because she would "see people who died before [who] want [her] to go with them."  (AR 143.)
Plaintiff stated that she needed assistance to dress, bathe, and care for her hair, and needed reminders
every day to take care of her personal needs, grooming, and to take her medicine.  (AR 143-44.)
Plaintiff's husband prepared her meals and he and her children took care of all the household chores.
(AR 144.)  Plaintiff stated that she was unable to do house or yard work because she had "too much
pain [in her] arms" as well as a "steady headache [and] dizziness."  (AR 145.)  Plaintiff was unable
to go out without a caretaker and was unable to go shopping.  (AR 145.)  Plaintiff indicated that her
only hobby was "sleep."  (AR 146.)  Plaintiff had no social activities and did not get along with
authority figures.  (AR 146-48.)  Plaintiff noted that she used crutches and a cane "any time[]" she
went out.  (AR 148.)  Plaintiff reported that she had "nightmares" and would see "ghosts" of her
"friend who died 20 years" previously.  (AR 149.)  Plaintiff stated that because she had been in a
"bad accident" and "died for a month" that she could not do any "cleaning, cooking, laundry,
shopping, bathing, grooming" and was "total[ly] dependent" upon her daughter.  (AR 149.)

On July 28, 2007, Plaintiff's daughter Chue Her completed a third-party function report.
(AR 150-57.)  Ms. Her indicated that Plaintiff's daily activities were to "walk[] around the house"
and to "take [a] nap sometimes."  (AR 150.)  Ms. Her reported that Plaintiff needed assistance with
her personal care due to "weakness" and "poor memory."  (AR 151.)  Plaintiff needed reminders to
take her medicine, which needed to be "put in her mouth" until she was "forced to swallow."
(AR 152.)  Ms. Her stated that Plaintiff had no social activities and needed someone to accompany
her "24 hours/every day."  (AR 154.)  Ms. Her indicated that Plaintiff had been in a "bad car
accident" and was unconscious for a month; "after that she [had] severe depression." (AR 157.)  Ms.
Her stated that Plaintiff was "functioning like a 6 year[-old] child."  (AR 157.)

## C.    Administrative Hearings

The Commissioner denied Plaintiff's applications initially and again on reconsideration;
consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").
(AR 80-84, 86-90, 93.)  ALJ Sharon L. Madsen held a hearing on April 7, 2009, at which Plaintiff
and vocational expert ("VE") Judith Najarian testified.  (AR 26-45.)

### 1.      Plaintiff's Testimony

Plaintiff testified through an interpreter that she was born in 1964 and became disabled as of June 30, 2006.  (AR 28-30.)  Plaintiff was married and had a total of twelve children (one had passed away); eight children still lived at home and the youngest one was in school.  (AR 30.) Plaintiff stated that she did not have a driver's license and did not know how to drive a car; she also did not know how to take a bus.  (AR 31.)  Plaintiff testified that she was unable to dress herself, do household chores, cook, or shop and that her husband or children handled those activities.  (AR 32.) Plaintiff would "lay on the sofa" during the day and was unable to engage in social activities such as attending church, temple, or Hmong celebrations due to her depression.  (AR 33.)

Plaintiff stated that she was in pain "all the time.  Constantly."  (AR 33.)  Medication would only provide temporary relief.  (AR 34.)  Plaintiff said that she walked with a cane because she had "pain" and "might fall down."  (AR 36.)  Plaintiff testified that she had been using a cane for "over one and a half years" and that a doctor had prescribed its use.  (AR 36.)

Plaintiff testified that a symptom of her depression was that she would "hear someone calling" her "all the time."  (AR 34-35.)  She was unable to concentrate and had difficulties getting along with people.  (AR 35.)  Plaintiff indicated that prior to her depression, she would get along with people, attend social activities, and was able to do household chores such as cooking and cleaning.  (AR 37.)

### 2.      VE Testimony

The ALJ asked the VE whether there were any jobs available for someone with Plaintiff's age, education, language, and work background and restricted to simple routine tasks and limited or occasional contact with the public.  (AR 40.)  After the VE confirmed that she was not to consider Plaintiff's use of a cane, the VE testified that, taking into consideration Plaintiff's limitations as to language, there were light jobs such as chip sorter, vacuum bottle assembler, and garment bagger. (AR 40-41.)  The ALJ requested medium level jobs restricted to simple routine tasks and limited interaction with the public.  (AR 41.)  The VE testified that positions such as bag loader, bag packer, cleaner II, and box bender were available.  (AR 42.)  The ALJ then requested the availability of light jobs; the response was the same as for the first hypothetical posed.  (AR 42.)  The ALJ posed a

1   hypothetical in which the person could not concentrate for more than 30 minutes at a time; the VE

2   testified that there were no jobs available for that hypothetical person.  (AR 42.)

3   **D.    ALJ's Decision**

4   On July 10, 2009, the ALJ issued a decision finding Plaintiff not disabled since January 31,

5   2007, the date of the application.  (AR 13-25.)  Specifically, the ALJ found that (1) Plaintiff had not

6   engaged in substantial gainful activity since the application date of January 31, 2007; (2) Plaintiff

7   had "severe" impairments of mild degenerative lumbar disc disease, possible angina, and major

8   depressive disorder based on the requirements in the Code of Federal Regulations; (3) Plaintiff did

9   not have an impairment or combination of impairments that met or equaled one of the impairments

10  set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the RFC to perform medium

11  work and was able to sit, stand, or walk for six hours in an eight-hour day, lift up to 50 pounds

12  occasionally and carry 25 pounds frequently, and had the mental capacity to perform simple, routine

13  tasks with only occasional contact with the public; (5) Plaintiff had no past relevant work experience;

14  (6) Plaintiff was defined as a younger individual on the alleged disability onset date; (7) Plaintiff was

15  unable to communicate in English and was considered in the same way as an individual who is

16  illiterate in English; (8) the transferability of job skills was not an issue because Plaintiff did not have

17  past relevant work; (9) there were jobs that exist in significant numbers in the national economy

18  which Plaintiff could perform; and (10) Plaintiff had not been under a disability as defined in the

19  Social Security Act since January 31, 2007, the date of the application.  (AR 18-24.)

20  Plaintiff sought review of this decision before the Appeals Council.  On June 18, 2010, the

21  Appeals Council denied review.  (AR 1-3.)  Therefore, the ALJ's decision became the final decision

22  of the Commissioner.  20 C.F.R. § 416.1481.

23  **E.    Plaintiff's Contentions on Appeal**

24  On August 18, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's

25  decision.  Plaintiff contends that the ALJ (1) improperly rejected the medical source opinions of Dr.

26  Parayno and Dr. Mouanoutoua; (2) made an erroneous finding as to Plaintiff's credibility; (3) did

27  not give specific, germane reasons to reject the lay testimony of Ms. Her, Plaintiff's daughter; and

28  (4) failed to meet Defendant's burden at Step Five.  (Doc. 14.)

**SCOPE OF REVIEW**

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

**APPLICABLE LAW**

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform his past work. *Id.* §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

**A.      The ALJ's Consideration of Medical Opinions**

Plaintiff argues that the ALJ gave improper reasons for rejecting the opinion of treating physician Dr. Parayno.  Specifically, Plaintiff contends that Dr. Parayno's treating opinion was improperly rejected as being contradicted by a one-time examining psychiatrist and non-examining state agency medical consultant. Plaintiff contends that the ALJ's finding that Dr. Parayno's opinion had limited applicability following Plaintiff's second hospitalization unfairly downplayed Plaintiff's condition.  The ALJ's assessment of some weight to Dr. Parayno's opinion indicating that Plaintiff had improved somewhat failed to acknowledge the finding that Plaintiff had a poor ability to maintain concentration. Additionally, the ALJ's finding that Plaintiff missed several sessions failed to account for her transportation problems and her need to care for her pre-school age children.

Plaintiff further contends that the ALJ improperly rejected Dr. Mouanoutoua's opinion as being based on a single undocumented examination and an uncritical acceptance of Plaintiff's allegations.

Defendant contends that the ALJ gave good reasons for relying on the consultative examiner's opinion regarding Plaintiff's abilities and properly gave that opinion substantial weight. Defendant further asserts that the ALJ considered the entirety of Plaintiff's treatment records and properly gave substantial weight to several years of mental health counseling notes that provided a longitudinal history of Plaintiff's mental state based on regular observations. The ALJ properly identified conflicts in the medical opinions, and then weighed and resolved those conflicts. Defendant argues that the ALJ properly gave less weight to Dr. Mouanoutoua's one-time assessment as it was a single undocumented examination and relied heavily on Plaintiff's subjective reporting of her complaints.

### 1. Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.[5] *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

---

[5] Defendant's argument implies that the standard set forth in *Lester* is improper and should not be considered by the Court. Defendant contends:

Notwithstanding the standards and rules set forth by Congress and the Commissioner, the Ninth Circuit

574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and

thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof,

and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2.    The ALJ Properly Rejected Dr. Parayno's Findings

In determining the severity and effect of Plaintiff's mental impairment, the ALJ gave

"substantial weight to the Mental Health counseling notes, which provide regular longitudinal

observations of [Plaintiff's] mental state in therapeutic and group settings." (AR 21.) The ALJ also

gave "substantial weight" to "Dr. Michiel's consultative psychiatric evaluation and to his opinion

that claimant would be able to carry out simple job instructions." (AR 21.)

The ALJ gave "[l]imited weight" Dr. Parayno's findings for the following reasons:

> Limited weight is given to Dr. Parayno's assessments of the claimant's functioning,
> since the first was completed after a few visits in the first three months of treatment
> and is contradicted by [Plaintiff's] examination findings at the consultative
> evaluation a month later. The December 2007[,] evaluation has limited applicability
> since it appears to reflect [Plaintiff's] state of mind immediately after her second
> hospitalization. The third assessment is given some weight, since it acknowledges
> [Plaintiff's] improvement and is somewhat consistent with the counseling
> observations.   The conclusion that the claimant has poor ability to maintain
> concentration is rejected, but in deference to Dr. Parayno's opinion, [Plaintiff] is
> limited to only occasional public contact.

(AR 22.)

The ALJ rejected Dr. Parayno's first two assessments at various points in Plaintiff's treatment

because the first assessment was conducted near the commencement of her treatment and was

contradicted by the findings of an examining physician a month later, and the second assessment was

conducted within days after Plaintiff's second hospitalization and therefore is a snapshot of her state

---

directs that an ALJ provide "clear and convincing" reasons to reject the opinion of a treating physician
when that opinion is uncontradicted. To the extent the Ninth Circuit's judicially-created standard
exceeds the requirements set forth by Congress and by the Commissioner at the behest of Congress,
it would appear to be improper. A reviewing court is limited to determining whether an ALJ's findings
are supported by substantial evidence and made in accordance with the Commissioner's regulations.

(Doc. 15, 7:25-8:2.)

Defendant's argument that *Lester* sets forth an improper reviewing standard has no merit. The Ninth Circuit's
decision in *Lester* – as with every published Ninth Circuit decision – is binding on this Court, regardless of whether a
party believes it was incorrectly decided.

of mind at that time.  Dr. Parayno's third assessment was partially credited, as it indicated that Plaintiff had made some improvements, which was consistent with the mental health treatment notes.

The ALJ properly considered the findings by the Fresno Mental Health counselors and Dr. Michiel when rejecting the opinions of Dr. Parayno.  While the opinions of treating sources, such as Dr. Parayno, are generally entitled to controlling weight or at least deference by adjudicators, if the treating doctor's opinion is contradicted, the ALJ may reject the opinion by "providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Lester*, 81 F.3d at 830.  It is the ALJ's responsibility to provide an interpretation of the facts and conflicting clinical evidence, and make a finding based on that interpretation *See Tommasetti*, 533 F.3d at 1041.  Here, the ALJ determined and relied upon the findings in the Fresno Mental Health counseling notes, which indicated that Plaintiff improved during her treatment, and the opinion of Dr. Michiel, which was based upon his independent evaluation and observation of Plaintiff during the examination.

### a.   The Fresno Mental Health Counseling Notes Showed Improvement by Plaintiff and May Be Relied Upon by the ALJ

As an initial matter, although not noted by the parties, the Court recognizes that Plaintiff was treated by social workers and certified mental health specialists at Fresno Mental Health.  (*See* AR 204-10, 304-19, 362-90, 401-03, 406-09.)  Such health professionals are not considered to be medical sources under the Social Security regulations. 20 C.F.R. § 416.913(a)(1) (establishing that medical sources are only considered to be licensed physicians (medical or osteopathic doctors), licensed or certified psychologists and, with certain limitations, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists).

The Commissioner, however, may consider evidence from sources such as therapists and social workers when determining the severity of a claimant's impairment.  20 C.F.R. § 406.913(d)(1); *see also* SSR 06-03p, 2006 WL 2329939, at * 2 ("information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the

severity of the impairment(s) and how it affects the individual's ability to function").[6] Ruling 06-03p further provides that opinions from other types of medical sources, "who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3.

According to SSR 06-03p, such opinions are important because, "depending on the facts in a case, after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical course' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* at *5. A medical source who is not "an acceptable medical source" may be given more weight if that source has "seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.*

Here, the record provided shows that Plaintiff was assessed by Dr. Paranyo on three occasions: in mid April 2007, on December 7, 2007, and on February 21, 2009. (AR 267-68, 334-38, 413-17.) In contrast, Plaintiff was seen at Fresno Mental Health on an almost weekly basis from January 2007 through October 2008 for what appear to be at least thirty visits. (*See* AR 204-10, 304-19, 362-90, 401-03, 406-09.) As such, there is substantial evidence in the record to establish that the ALJ could properly state that the Fresno Mental Health counseling notes provided "longitudinal observations" that supported "the conclusions that the claimant's depressive symptoms were ameliorated by medication and counseling" and that Plaintiff "was able to participate freely in group sessions and did not display any severe depressive or psychotic symptoms." (AR 21, 22.)

The record indicates that Plaintiff was seen at Fresno Mental Health from January 2007 through October 2008, including through the periods relating to both her psychiatric hospitalizations in January 2007 and November 2007. (*See* AR 204-10, 304-19, 388-90, 401-03, 406-09.) When Plaintiff began her counseling, she "reported feeling sad, depressed," had "no motivation," and that

---

[6] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding precedent upon ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

and that she had "no interest[] in doing any thing [sic]" including participating in group meetings. (AR 210.)  Within approximately two months, Plaintiff became "animated and alert" and was more "involved" in group discussion.  (AR 205.)  On November 30, 2007, the counseling notes following Plaintiff's second hospitalization indicated that she reported feeling "sad, depressed, [and] helpless," but that she was taking her medication as prescribed and following the hospital direction upon discharge.  (AR 388.)

After Plaintiff's November 2007 hospitalization, the Fresno Mental Health counseling notes show improvement in Plaintiff's mental condition.  Although Plaintiff was noted as having a "low stress and frustration tolerance" and "difficult[ies]. . . manag[ing] her anger," she was also "participating in [a] Hmong support group and receiving psychotropic medications" so as to "learn coping and problem[] solving skills to cope with daily stressors, to reduce depression, [and] to avoid suicide thoughts or attempts and hospitalization."  (AR 386.)  On February 14, 2008, Plaintiff noted she was upset because she did "not receive appropriate attention from her family and her husband did not understand her anguish."  (AR 379.)  However, by May 1, 2008, Plaintiff indicated that she had "less verbal arguments with her husband because she is able to manage her feelings."  (AR 372.)

On May 15, 2008, Plaintiff stated that her relationship with her husband had become "amicable."  (AR 371.)  On June 12, 2008, Plaintiff indicated that she was "content[]" with the "love and care that she received from her family."  On June 26, 2008, Plaintiff appeared to be "in good spirit" and stated that she no longer had suicidal ideation "because she loves her family"; she was also "involved more in family activities and social life than she [had been] before."  (AR 369.)  The notes further indicated that Plaintiff had benefitted from the "therapeutic services" since "her daily functioning had increased" and she was "involved more in family chores and supervis[ing] her children."  (AR 369.)  Plaintiff's relationship with her husband remained "amicable" and Plaintiff was "able to control her emotions and express[] feelings in an appropriate way."  (AR 369.)

On October 17, 2008, although Plaintiff stated that she still "continued to feel depressed and helpless because of he[r] physical problems," she was "feeling less depressed and less tearful" than when she had first started therapy.  (AR 363.)   While the counseling notes indicated that Plaintiff

still needed "support," they also stated that Plaintiff should be "able to do things for herself that will

help to reduce[] her depressed and helpless feelings." (AR 363.)

As such, the ALJ properly compared the conflicting evidence between the improvement

shown in the Fresno Mental Health counseling notes and Dr. Parayno's findings, made an

interpretation of those facts and conflicting clinical evidence, and made a finding based on that

interpretation. *See Tommasetti*, 533 F.3d at 1041.  Since the ALJ applied the proper legal standard

and substantial evidence exists in the record to support the Commissioner's findings regarding

Plaintiff's improvements during treatment, the Court must affirm the decision. *See Lewis*, 498 F.3d

at 911 ("We affirm the district court if the Commissioner's decision was supported by substantial

evidence and based on proper legal standards.")

### b.    The ALJ May Rely Upon Dr. Michiel's Findings

In finding that Dr. Parayno's first assessment of Plaintiff in mid-April 2007 should be given

"[l]imited weight," the ALJ determined that the findings were "completed after a few visits in the

first three months of treatment, and [are] contradicted by the claimant's examination findings at the

consultative evaluation a month later." (AR 22.)  Plaintiff was seen by Dr. Michiel on April 28,

2007, who performed a psychiatric evaluation. (AR 269-71.)  Dr. Michiel diagnosed Plaintiff as

having psychotic disorder not otherwise specified and depressive disorder not otherwise specified.

(AR 271.)

Plaintiff informed Dr. Michiel that she was "able to take care of her personal hygiene" but

could "not do any more" and did "not go out." (AR 270.)  Dr. Michiel performed a mental status

examination and found that Plaintiff's attitude and behavior were "normal," her mood "depressed,"

and her "[a]ffect was restricted [and] sad." (AR 270-71.)  Dr. Michiel found that Plaintiff's thought

process was "goal-directed" and her "[t]hought content was not delusional" but that she stated that

she was "fearful around people." (AR 271.)  Dr. Michiel stated that although Plaintiff "[a]dmits to

auditory and visual hallucinations," there was "no evidence during the interview of any response to

internal stimuli." (AR 271.)  Dr. Michiel opined that Plaintiff was "able to maintain attention and

concentration and to carry out simple job instructions," "able to relate and interact with coworkers,

supervisors, and the general public," but would be "unable to carry out an extensive variety of technical and/or complex instructions." (AR 271.)

Plaintiff contends that Dr. Michiel's observations do not, in fact, support his own findings but instead support Dr. Parayno's findings. (Doc. 14, pp. 8-9.) Further, Plaintiff asserts that Dr. Michiel was not aware of Plaintiff's full mental health history as he failed to note her prior psychiatric hospitalization in January 2007. (Doc. 16, 3:22-25; *see* AR 269.)

While Dr. Michiel's report failed to note that Plaintiff has been previously hospitalized, it did accurately indicate that she was attending "group therapy one a week" and that she was "under the care of a psychiatrist who has prescribed medication." (AR 269.) Further, Plaintiff fails to show how Dr. Michiel's silence as to Plaintiff's hospitalization was material to his opinion formulation, since his findings were based on his independent examination and questioning of Plaintiff. (Doc. 269.) An examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination." *Tonapetyan*, 242 F.3d at 1149.

Here, Dr. Michiel independently examined Plaintiff and established his own conclusions based upon that examination. Such "opinions [may] serve as substantial evidence supporting the ALJ's findings." *Id*. As such, the Court finds that the ALJ's decision properly relied upon Dr. Michiel's findings and conclusions.

### 3. The ALJ Properly Rejected Dr. Mouanoutoua's Findings

The ALJ rejected the opinion of examining physician Dr. Mouanoutoua and made the following findings:

> No weight is given to Dr. Mouanoutoua's March 2009 assessment of the claimant's mental capacity, because it was based on a single undocumented examination and shows an uncritical acceptance of the claimant's allegations []; however, as discussed below, the claimant is not entirely credible. This very limiting assessment is also contradicted by Dr. Parayno's February 2009 statement, which showed that the claimant's mental condition had improved, as well as by the Mental Health counseling notes, which showed that the claimant was able to participate freely in group sessions and did not display any severe depressive or psychotic symptoms.

(AR 22.)

Dr. Mouanoutoua saw Plaintiff on March 19, 2009, and completed a mental medical report form and medical assessment. (AR 418-22.) Dr. Mouanoutoua opined that Plaintiff had a poor

ability to follow work rules, relate to coworkers, deal with the public, interact with supervisors, and maintain attention and concentration, and had no ability to use judgment, deal with work stress, or function independently. (AR 419.)   Dr. Mouanoutoua found that Plaintiff's ability to carry out simple instructions was "fair" but "limited" and needed "supervision/encouragement." (AR 420, 422.)  Her ability to carry out technical or complex job instructions was "impossible," as was her ability to deal with the public and withstand the stress and pressures of a work day. (AR 422.)  Dr. Mouanoutoua opined that Plaintiff had a "poor prognosis due to her responses to past [treatment]." (AR 422.)

The ALJ discounted Dr. Mouanoutoua opinion as it was based on a "single undocumented examination" of Plaintiff. (AR 22.)  The fact that Dr. Mouanoutoua examined Plaintiff only once is not a specific, legitimate reason for rejecting the doctor's opinion.  The ALJ must consider the opinions of examining physicians. *See Lester*, 81 F.3d at 830; 20 C.F.R. § 416.927.  Therefore, the fact that Dr. Mouanoutoua's opinion is based on a one-time examination is not a valid reason for rejecting the opinion.

However, the ALJ also rejected Dr. Mouanoutoua's opinion because it was uncritical of Plaintiff's allegations and was inconsistent with Dr. Parayno's February 2009 opinion and findings stated in the Fresno Mental Health counseling notes. (AR 22.)  Dr. Mouanoutoua's report does not indicate any independent clinical findings but is instead based on Plaintiff's reporting. (AR 418.)  As discussed below, the ALJ properly found Plaintiff to be less than fully credible.  An ALJ may reject a physician's opinion "if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041 (citation omitted).

Further, Dr. Mouanoutoua's determination that Plaintiff had a "poor prognosis due to her response to past [treatment]" (AR 422) is contradicted by Dr. Parayno's February 2009 finding that Plaintiff had made some improvement and that her response to treatment was "fair" (AR 413) and, as discussed above, the Fresno Mental Health notes indicating Plaintiff's improvement throughout her counseling. (*See, e.g.*, AR 362-90.)  The ALJ may discredit a physician's findings if they are "conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v.Comm'r Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2004).  Here, the ALJ properly

discounted Dr. Mouanoutoua's opinion as lacking objective medical findings and as being

contradicted by the medical record.

**B.     The ALJ's Determination of Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to set forth legally sufficient reasons for rejecting her

subjective complaints.   According to the Commissioner, however, the ALJ gave valid reasons for

finding Plaintiff not entirely credible.   In considering Plaintiff's credibility, the ALJ found that

Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms and that her statements concerning the intensity, persistence and limiting effects of these

symptoms are not credible."  (AR 22.)

**1.     Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must

engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).   First, the ALJ

must determine whether the claimant has presented objective medical evidence of an underlying

impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*

The claimant is not required to show that her impairment "could reasonably be expected to cause the

severity of the symptom she has alleged; she need only show that it could reasonably have caused

some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the claimant meets

the first test and there is no evidence of malingering, the ALJ can only reject the claimant's

testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons"

for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including
> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for
> lying, prior inconsistent statements concerning the symptoms, and other testimony
> by the claimant that appears less than candid; (2) unexplained or inadequately
> explained failure to seek treatment or to follow a prescribed course of treatment; and
> (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial
> evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*

*Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529,

416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from

physicians and third parties concerning the nature, severity, and effect of the symptoms of which he

complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### 2. The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Subjective Complaints

In this case, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to produce the alleged symptoms. (AR 22.) Therefore, absent affirmative

evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and

convincing. *Vasquez*, 572 F.3d at 591.

The ALJ provided numerous reasons as to why she found that Plaintiff was "not entirely

credible." (AR 22.) Specifically, the ALJ found:

> The claimant's testimony about her chronic severe pain and use of a cane is not
> supported in the treating record; this shows that the claimant has never been
> prescribed a cane and does not have difficulty ambulating. The claimant is generally
> prescribed regular Tylenol and muscle relaxant for pain symptoms, which suggests
> that she does not have severe pain. Her testimony that her psychiatric medications
> are ineffective is not reflected in Dr. Parayno's notes, and is contradicted by the
> observations in the Mental Health counseling notes. Further, the extreme physical
> and mental symptoms to which she testified are not observed in the regular Kings
> Winery clinical notes; these reflect routine care for her complaints. The claimant has
> been in the United States since June 1989 but denies that she is able to speak and
> English . . . . The record shows that she has never worked . . . . Her testimony about
> her limited daily activities is contradicted by her statement to Dr. Michiel that she
> could care of her personal needs . . . and by the Mental Health notes in January 2007
> that she did most of the housework . . . . In November 2007 the notes reflect that the
> claimant was occupied during the day caring for her younger children . . . . At least
> initially, the claimant was not compliant with her psychiatric medications . . . . These
> factors suggest that the claimant is exaggerating the severity of her mental and
> physical limitations. The claimant did not have difficulty following the course of the
> hearing, though she sometimes gave evasive answers. This observation is not the
> only factor lessening the credibility of her testimony, but is permissible when
> considered with the other reasons discussed above.

(AR 22-23.) Plaintiff asserts that the reasons provided by the ALJ are incorrect and thus the ALJ

failed to provide clear and convincing reasons to reject Plaintiff's testimony. (Doc. 14, pp. 13-19.)

In finding that Plaintiff was not entirely credible, the ALJ noted that Plaintiff's testimony was

not supported by the medical record. Although "a finding that the claimant lacks credibility cannot

be premised wholly on a lack of medical support for the severity of his pain," *Light*, 119 F.3d at 792,

it is one factor that may be considered. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155,

1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."(citation omitted)); *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999) ("Citing the conflict between [the plaintiff's] testimony of subjective complaints and the objective medical evidence in the record, and noting the ALJ's personal observations, the ALJ provided specific and substantial reasons that undermined [the plaintiff's] credibility.")

Here, the crux of Plaintiff's assertions is that the ALJ improperly interpreted the evidence in the record against Plaintiff when the evidence actually supported Plaintiff. (Doc. 14, pp. 15-19.) However, the evidence in the record is subject to multiple interpretations. Thus, even if "the ALJ's interpretation . . . may not be the only reasonable one," so long as it is "still a reasonable interpretation and is supported by substantial evidence" it is not the Court's "role to second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted). Accordingly, as long as the ALJ provides a reasonable interpretation of the evidence that is supported by the record, the Court must affirm the decision.

The ALJ provided such an interpretation. For example, Plaintiff contends that "[t]he fact that the records do not contain a prescription for a cane does not mean that Plaintiff was never prescribed a cane" and insists that the ALJ should have contacted Plaintiff's medical providers to determine whether a cane was needed. (Doc. 14, p. 15.) However, Plaintiff fails to account for the fact that the ALJ noted the medical evidence provided that Plaintiff "does not have difficulty ambulating." (AR 23; *see also* AR 208 (Fresno Mental Health notes indicating that Plaintiff "walks without a cane"); AR 270 (Dr. Michiel noting that Plaintiff's "gait and posture [were] normal"); AR 277 (Dr. Damania finding that "[n]o assistive device is necessary for ambulation").) Plaintiff further contends that the Kings Winery clinical notes and the Fresno Mental Health notes are entirely consistent with Plaintiff's testimony; however, the ALJ correctly noted that Plaintiff's testimony that her psychiatric medications were ineffective was contradicted by the findings of Dr. Parayno and the counselors at Fresno Mental Health showing that Plaintiff had made improvement during the course of her treatment. (AR 23; *see also* AR 363, 413.) Further, the ALJ based her credibility finding on her own personal observations of Plaintiff at the hearing. (AR 23.) "The inclusion of the ALJ's personal

observations does not render the decision improper." *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985).

The Court agrees with Plaintiff's assertion that the ALJ incorrectly considered Plaintiff to be less than credible because she denied that she was able to speak English despite being in the United States since June 1989.  (AR 23.)   The record establishes that Plaintiff was unable to communicate in English, as she testified at the hearing through an interpreter, spoke with doctors through an interpreter, and attended a Hmong language support group at Fresno Mental Health. (*See, e.g.*,  AR 26, 28, 269, 272, 386.)  However, the ALJ's error in this one instance is not fatal to the ultimate determination concerning Plaintiff's credibility, as ALJ provided numerous reasons supported by substantial evidence in the record to establish that Plaintiff's was not entirely credible. (AR 22-23.)

"'Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation ... and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.'" *Morgan*, 169 F. 3d at 600.  As the ALJ's reasons were properly supported by the record and sufficiently specific, the Court must thus conclude that the ALJ rejected Plaintiff's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

## C.    The ALJ's Consideration of Lay Testimony

Plaintiff argues that the ALJ failed to provide specific, germane reasons for rejecting the testimony of Plaintiff's daughter, Chue Her.  (Doc. 14, p. 19.)  The Commissioner counters that the ALJ properly discounted the statement of the lay witness.

### 1.    Legal Standard

"While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing 'reasons that are germane to each witness.'" *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Turner*, 613 F.3d at 1224; *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons."  *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness

testimony if it is inconsistent with the record. *See, e.g., id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (rejecting lay witness testimony conflicting with the medical record). Further, the ALJ may "draw inferences logically flowing from the evidence." *Sample*, 694 F.2d at 642.

## 2.     The ALJ Provided Specific, Germane Reasons to Reject Lay Testimony of Plaintiff's Daughter

The ALJ's considered the third-party lay testimony of Plaintiff's daughter, Chue Her, as follows:

> I have also considered the Third Party Statement completed in March 2007 by the claimant's daughter . . . . This showed that the claimant could not care for her personal needs and did no housework or childcare.  Little weight is given to this document since it is contradicted by the medical records, as described above.

(AR 23.) The ALJ rejected the third-party lay testimony as being unsupported by the medical record. Plaintiff contends that this reason was unsound, since the medical record supported Plaintiff's claims and thus supported her daughter's statement. (Doc. 14, p. 20.)

As discussed above, the ALJ's decision was properly determined and there was substantial evidence in the medical record to support the ALJ's findings that Plaintiff's claims were inconsistent with the medical findings. As such, the ALJ could properly discount the third-party lay witness testimony for also being contradicted by medical evidence.  "An ALJ need only give germane reasons for discrediting the testimony of lay witnesses.  Inconsistency with medical evidence is one such reason." *Bayliss*, 427 F.3d at 1218.

## D.     The ALJ Met Her Burden at Step Five

As noted above, the ALJ must conduct a five-step analysis in evaluating a claimant's disability.   At Step Five, it is the Commissioner's burden to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* § 416.920(g).  Plaintiff contends that the ALJ failed to meet that burden because the RFC finding and hypothetical question posed to the VE did not accurately reflect Plaintiff's actual limitations.  (Doc. 14, p. 20.)

The ALJ determined that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c); could sit, stand, or walk for six hours in an eight-hour day; could occasionally lift up to 50 pounds and frequently lift and carry 25 pounds; and had the mental capacity to perform simple routine tasks with only occasional contact with the public. (AR 19.)  The ALJ based her findings on the substantial medical evidence in the record, which, as discussed above, she properly determined.

At the hearing held before the ALJ on April 7, 2009, the VE testified to a hypothetical question posed by the ALJ that contained all the limitations that the ALJ found credible and supported by the record.  (AR 40-42.)  The VE testified that there were jobs that existed in significant numbers that Plaintiff could perform.  (AR 40-42.)  When "[t]he hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record," then "[t]he ALJ's reliance on testimony the VE gave in response to the hypothetical therefore was proper."  *Bayliss*, 427 F.3d at 1217 (citation omitted).  "Further, the ALJ's reliance on the VE's testimony regarding the number of relevant jobs in the national economy was warranted.  An ALJ may take administrative notice of any reliable job information, including information provided by a VE."  *Id.* at 1218.

Because the hypothetical posed by the ALJ to the VE was supported by the record and complete, and the VE testified as to jobs that Plaintiff could perform, the ALJ's Step Five finding was proper.

## CONCLUSION AND RECOMMENDATION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that the Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED.

These Findings and Recommendation are submitted to the district judge assigned to this action, pursuant to the 28 U.S.C. § 636(b)(l)(B) and this Court's Local Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and

recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    February 9, 2012**                    _____**/s/ Sheila K. Oberto**_____
                                                           UNITED STATES MAGISTRATE JUDGE